United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 4, 2002    Decided July 2, 2002

Nos. 01-1070 & 01-1158

Sierra Club, Petitioner

v.

Environmental Protection Agency and
Christine Todd Whitman, Administrator
Respondents

On Petitions for Review of an Order of the
Environmental Protection Agency

    David S. Baron argued the cause for petitioner.  With him on the briefs was Howard I. Fox.

    Martin F. McDermott, Attorney, U.S. Department of Justice, argued the cause for respondents.  With him on the brief were John C. Cruden, Assistant Attorney General, and Sara Schneeberg, Attorney, U.S. Environmental Protection Agency.  David A. Carson, Attorney, U.S. Department of Justice, entered an appearance.

Thurbert E. Baker, Attorney General, State of Georgia, Patricia T. Barmeyer, Special Assistant Attorney General, Jeremiah W. (Jay) Nixon, Attorney General, State of Missouri, James R. Layton, Solicitor, James E. Ryan, Attorney General, State of Illinois, A. Benjamin Goldgar, Assistant Attorney General, and Donald Trahan were on the brief for amici curiae State of Georgia, et al., in support of respondent. Katherine L. Rhyne entered an appearance.

Randolph A. Beales, Attorney General, Commonwealth of Virginia, Roger L. Chaffe, Senior Assistant Attorney General, and Carl Josephson, Assistant Attorney General, were on the brief for amicus curiae Commonwealth of Virginia, in support of respondent.

Albert M. Ferlo, Jr., Sheila D. Jones, and John J. Bosley were on the brief for amicus curiae Metropolitan Washington Air Quality Committee, in support of respondent.

Before: Ginsburg, Chief Judge, Edwards and Sentelle, Circuit Judges.

Opinion for the Court filed by Chief Judge Ginsburg.

Ginsburg, Chief Judge: The Sierra Club petitions for review of a decision by the Environmental Protection Agency approving revisions to the state implementation plans for ozone in the Washington, D.C. Metropolitan Area. The Club contends the EPA was without authority to approve revised SIPs that extend the Area's deadline for attainment and do not provide for the States concerned to adopt reasonably available control measures, annual rates of progress in reducing emissions, and specific contingency measures to take effect should the Area fail to achieve scheduled reductions in emissions.

We hold that the EPA exceeded its authority and that its decision is otherwise arbitrary and capricious in the above respects. Therefore, we grant the petition and remand this matter to the EPA for further proceedings.

## I. Background

Section 109 of the Clean Air Act directs the EPA to promulgate National Ambient Air Quality Standards

(NAAQS) for ozone, see 42 U.S.C. s 7409, and Title V of the Act delegates to the states primary responsibility for implementing those standards, see id. ss 7407, 7410. A state discharges this responsibility by developing and enacting a state implementation plan (SIP) that provides for "implementation, maintenance, and enforcement" of the standards in each "air quality control region" within its jurisdiction, subject to the EPA's approval and supervision. Id. s 7410(a)(1).

If an area "does not meet the NAAQS or it contributes to ambient air quality in a nearby area that does not meet the NAAQS," then the EPA designates the area as one of "nonattainment," id. s 7407(d)(1)(A), and classifies the degree of nonattainment in the area as marginal, moderate, serious, severe, or extreme, see id. s 7511(a), (b)(2). This classifica-

tion determines both the date by which the area must attain the NAAQS and the stringency of the measures that the area must implement in the meantime to reduce emissions of volatile organic compounds (VOCs) and oxides of nitrogen (NOx), both of which are the precursors of ozone. See id. s 7511(a).

All states were required to revise their SIPs to bring any areas of "serious" nonattainment into attainment "as expeditiously as practicable but not later than" November 15, 1999. Id. ss 7511(a)(1), 7511a(c)(2)(A). The Act specifies that a revised SIP must contain certain elements, including: "the implementation of all reasonably available control measures [RACM]," id. s 7502(c)(1); annual demonstrations of "reasonable further progress," id. s 7502(c)(2), defined--with an exception not here relevant--as a reduction in the emission of VOCs at a rate of "at least 3 percent of baseline emissions each year," id. s 7511a(c)(2)(B)(i); and contingency measures "to be undertaken if the area fails to make reasonable further progress, or to attain" the NAAQS by November 15, 1999, id. s 7502(c)(9). The states were required to submit the revised SIPs to the EPA for approval, which the Agency was required to grant if the "revision [met] all the requirements ... [and] would be adequate to attain and maintain the [NAAQS] by the attainment date specified." Id. s 7509a(a)(1), (2).

An area of serious nonattainment that failed to reach attainment by the deadline was to be reclassified by operation of law to "severe" nonattainment status. See id. s 7511(b)(2)(i). The deadline for attainment would then be extended until November 15, 2005, see id. s 7511(a)(1), but the area would be required again to revise its SIP to implement still more rigorous programs for monitoring and reducing emissions, see id. s 7511(b)(2)(A)(i).

The Washington, D.C. Metropolitan Area comprises the District of Columbia and several counties each in Maryland and Virginia. In 1991 the EPA declared the Washington Area to be in "serious" nonattainment of the NAAQS for ozone. See Designation of Areas for Air Quality Planning Purposes, 56 Fed. Reg. 56,694, 56,738, 56,772, 56,841 (Nov. 6, 1991) (codified respectively at 40 C.F.R. ss 81.309, .321, .347 (2002)). In response, the District of Columbia Department of Health, the Maryland Department of the Environment, and the Virginia Department of Environmental Quality (hereinafter referred to as "the States") submitted nonattainment SIPs for the Washington Area, see Approval & Promulgation of Air Quality Implementation Plans, 66 Fed. Reg. 586 (Jan. 3, 2001) (Approval), pursuant to section 172(b) of the Act, 42 U.S.C. s 7502(b).

The three proposed SIPs did not provide for attainment by November 15, 1999. See Proposed Rule, Approval & Promulgation of Air Quality Implementation Plans, 64 Fed. Reg. 70,460, 70,476-77 (Dec. 16, 1999) (Proposed Approval). Instead, the States requested that the EPA extend the attainment deadline for the Washington Area until November 15, 2005 without reclassifying as "severe" the nonattainment status of the Area. See id. The EPA previously had recognized that for certain "downwind areas, transport [of ozone] from upwind areas ha[d] interfered with their ability to demonstrate attainment" by the deadlines established in the Act. Extension of Attainment Dates for Downwind Transport Areas, 64 Fed. Reg. 14,441, 14,442 (Mar. 25, 1999). As a result, according to the EPA, many downwind areas "fac[ed] the prospect of being reclassified ... to a higher nonattainment classification in spite of the fact that pollution that is

beyond their control contributes to the levels of ozone they experience." Id. With this in mind, the Agency granted the States' request for an extension, see Approval, 66 Fed. Reg. at 630-31, determining that the transport of ozone and its precursors into the Washington Area could delay the date by which the Area would reach attainment, id.

The States did not propose in their revised SIPs to adopt any RACM, and the EPA concluded that none was warranted because "additional emission control measures would not advance the attainment date." Id. at 608/1. Nor did the revised SIPs provide for annual rates of progress (ROP) in reducing emissions for the years after 1999, see id. at 603; or for any contingency measures "to make up for any emission reduction shortfall, either in achievement of ROP milestones or for failure to attain" the NAAQS, see id. at 615/2. The EPA determined that these omissions, too, were warranted. It deemed the ROP requirement "unreasonable" in light of the transport of ozone into the Washington Area, id. at 603/2, and it held that contingency measures are not mandatory elements of a SIP revision that establishes the attainment deadline and ROP for an area, see id. at 615/3. Consequently, the Agency approved the revised SIPs.

The Sierra Club now petitions for review of that decision. Amicus briefs have been filed by the Metropolitan Washington Air Quality Committee, the State of Virginia, and the States of Georgia, Illinois, Louisiana, and Missouri, all in support of the EPA's decision approving the revised SIPs.

## II. Analysis

The Sierra Club claims that the Approval is unlawful for four reasons: (1) the EPA had no authority to extend the attainment deadline for the Washington Area; (2) the EPA applied an unreasonable standard for determining whether a control measure is "reasonably available" for purposes of s 172(c)(2) of the Act; (3) the Act prohibits the EPA from approving a SIP that does not provide for ROP reductions; and (4) the Act prohibits the EPA from approving a SIP that does not include contingency measures.

We review the EPA's interpretation of the Clean Air Act under the standards set out in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). If the Congress "has directly spoken to the precise question at issue," id. at 842, then we must "give effect to [its] unambiguously expressed intent," id. at 843. If, however, the intent of the Congress is ambiguous with respect to the question before us, then we defer to the Agency's interpretation if it is "based on a permissible construction of the statute." Id.

A.  Extension of the Attainment Deadline

We agree with the Sierra Club that the plain terms of the Act preclude an extension of the sort the EPA granted here. Pursuant to s 181(a)(1), 42 U.S.C. s 7511(a)(1), "each" area of "serious" nonattainment was required to meet the NAAQS by November 15, 1999. That deadline could be extended in certain limited circumstances or when an area was reclassified as one of "severe" nonattainment. Id. s 7511(b)(2)(i), (3). In this case, the EPA neither determined that the Washington Area fit those limited circumstances nor acknowledged that the Area was reclassified as "severe."

The EPA characterizes the issue before the court as follows: "whether an attainment date extension is available without an accompanying reclassification to 'severe' nonattainment status where the Washington area's ability to attain has been demonstrably compromised by upwind emissions outside its control." Fair enough, but as the Sierra Club points out, the Act details the conditions in which the EPA may extend the attainment deadline, without reclassification, to account for upwind emissions that compromise an area's ability to come into attainment, and none of them is implicated here. For example, the Act exempts from the attainment deadlines any area that would be in attainment "but for emissions emanating from outside of the United States," 42 U.S.C. s 7509a(b); and "an[y] ozone nonattainment area that does not include, and is not adjacent to, any part of a Metropolitan Statistical Area," id. s 7511a(h)(1), provided the "emissions within the area do not make a significant contribution to the ozone concentrations measured in the area or in

other areas," id. s 7511a(h)(2).  We cannot but infer from the presence of these specific exemptions that the absence of any other exemption for the transport of ozone was deliberate, and that the Agency's attempt to grant such a dispensation is contrary to the intent of the Congress.

   The EPA also contends the Approval "falls within this Court's parameters for when it will look beyond a 'literal' reading of a statute," but the Agency does not show that this is one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."  Engine Mfrs. Ass'n v. EPA, 88 F.3d 1075, 1088 (D.C. Cir. 1996).  Because our "role is not to 'correct' the text so that it better serves the statute's purposes," id., we will not "ratify an interpretation that abrogates the enacted statutory text absent an extraordinarily convincing justification," Appalachian Power Co. v. EPA, 249 F.3d 1032, 1041 (D.C. Cir. 2001).  Here the EPA asserts that "[a]s a matter of 'logic and statutory structure,' Congress 'almost surely' could not have meant to require" the Agency to treat the Washington Area as one of severe nonattainment merely because its "attainment has been temporarily stalled due to transported pollution."  This assurance does nothing to persuade us that, although s 181(a)(1), 42 U.S.C. s 7511(a)(1), as written sets a deadline without an exception for setbacks owing to ozone transport, "all the other evidence from the statute points the other way," United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993);  see also Engine Mfrs., 88 F.3d at 1088 ("there must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning").

   We reject also the EPA's argument that we must accept its interpretation of the Act in order to give effect to the "broader congressional intent not to punish downwind areas affected by ozone transport."  The most reliable guide to congressional intent is the legislation the Congress enacted and, as we have seen, the Act itself reveals no intention to allow for an extension in circumstances like those affecting the Washington Area.  Similarly, it is of no moment that the

extension may be, as the Agency claims, "a reasonable accommodation of ... the statutory attainment date and interstate transport provisions"; it is not the accommodation the Congress made. An agency may not disregard "the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy." Engine Mfrs., 88 F.3d at 1089.

Finally, the EPA argues that our decision in Natural Res. Def. Council, Inc. v. EPA, 22 F.3d 1125, 1135 (D.C. Cir. 1994), approving its extension of the deadlines by which states had to submit elements of their SIPs, compels a similar result in this case. Although we upheld the EPA's decision in that case to extend the deadline for compliance with a procedural requirement of the Act, the Agency's failure to meet its own deadline for providing guidance to the states necessitated that we do so, see id., 22 F.3d at 1135 ("The agency's failure to meet its November 15, 1991 deadline ... made it impossible for states ... to meet their November 15, 1992 ... submission deadline"). In extending another procedural deadline under similar circumstances, we since have emphasized the importance that "the attainment deadlines remain intact, complete with additional program obligations in the event of nonattainment, irrespective of a state's dereliction of the SIP process," NRDC v. Browner, 57 F.3d 1122, 1127 (D.C. Cir. 1995). Unlike the various deadlines by which the states must submit proposals, the attainment deadlines are "central to the ... regulatory scheme and ... leave[ ] no room for claims of technological or economic infeasibility." Union Elec. Co. v. EPA, 427 U.S. 246, 258 (1976).

In sum, to permit an extension of the sort urged by the EPA would subvert the purposes of the Act. Cf. NRDC v. Browner, 57 F.3d at 1128 (extension of procedural deadline "not incompatible with the multi-faceted statutory scheme as a whole"). Therefore, we hold that the EPA was without authority in the Act or in our precedent to extend the attainment deadline for the Washington Area.

B.   Reasonably Available Countermeasures

Section 172(c)(1) of the Act directs that a state's revised SIP "shall provide for the implementation of all reasonably

available control measures [RACM] as expeditiously as practicable." 42 U.S.C. s 7502(c)(1). As the EPA has interpreted s 172(c)(1), a state must "consider all potentially available measures to determine whether they [a]re reasonably available for implementation in the area, and whether they would advance the [area's] attainment date." Approval, 66 Fed. Reg. at 607/3. The state may "reject measures as not being RACM," however, if "they would not advance the attainment date, would cause substantial widespread and long-term adverse impacts, or would be economically or technologically infeasible." Id. at 608/1.

The proposed revisions to the SIPs for the Washington Area "contained no measures adopted for the sole purpose of satisfying the RACM requirement," id. at 609/3, so the EPA reviewed on its own initiative all control measures that could qualify as RACM under its definition, see id. at 607/3. After considering "all potential categories of stationary and mobile sources that could provide additional emission reduction," id. at 611/2, the EPA "concluded that additional emission control measures would not advance the attainment date and therefore do not constitute RACM," id. at 608/1.

The Sierra Club maintains that treating as potential RACM only those measures that would advance the date at which an area reaches attainment "conflicts with the Act's text and purpose and lacks any rational basis." This is a misreading of both text and context.

The Act, on its face, neither elaborates upon which control measures shall be deemed "reasonably available," nor compels a state to consider whether any measure is "reasonably available" without regard to whether it would expedite attainment in the relevant area. Further, the EPA reasonably concluded that because the Act "use[s] the same terminology in conjunction with the RACM requirement" as it does in requiring timely attainment, compare 42 U.S.C. s 7502(c)(1) (requiring implementation of RACM "as expeditiously as practicable but no later than" the applicable attainment deadline), with id. s 7511(a)(1) (requiring attainment under same constraints), the RACM requirement is to be understood as a

means of meeting the deadline for attainment, Approval, 66 Fed. Reg. at 610/2.  Because the statutory provision is ambiguous and the EPA's construction of the term "RACM" is reasonable, we defer to the Agency.  See Chevron, 467 U.S. at 843.

The Sierra Club also claims it was unreasonable for the EPA to reject certain measures as RACM on the ground that they could not be implemented without "intensive and costly effort."  Far from erecting thereby an unreasonably "subjective and undefined" standard, as the Sierra Club argues, see Pearson v. Shalala, 164 F.3d 650, 660-61 (D.C. Cir. 1999), the EPA here did no more than give familiar content to an insufficiently specified concept.  The Congress's choice of the phrase "reasonably available" clearly bespeaks its intention that the EPA exercise discretion in determining which control measures must be implemented, and neither that phrase nor any other in s 172(c)(1) suggests that the Congress intended to preclude the EPA, in so doing, from considering the costs of its decisions.  Compare Natural Res. Def. Council, Inc. v. EPA, 824 F.2d 1146, 1157 (D.C. Cir. 1987) (en banc) (rejecting "position that, as a matter of statutory interpretation, cost and technological feasibility may never be considered under the Clean Air Act unless Congress expressly so provides"), with Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 465 (2001) (cost considerations precluded when statute "instructs the EPA to set primary ambient air quality standards 'the attainment and maintenance of which ... are requisite to protect the public health' with 'an adequate margin of safety' ") (quoting 42 U.S.C. s 7409(b)(1)).

That the EPA's definition of RACM is valid does not end the matter, however;  as the Sierra Club points out, the Agency failed to consider whether any particular measures fell within that definition.  In its Proposed Approval, the EPA noted that "measures ... such as retrofitting diesel trucks and buses, and controlling ground service equipment at airports [could] ... if taken together ... provide significant emission reductions for attainment purposes."  64 Fed. Reg. at 70,468.  The EPA made no mention of these measures or measures like them, however, either in its analysis of

potential RACM for the Washington Area or in the Approval document. This omission--whether the result of inadvertence or of an unexplained change of course--renders the EPA's decision arbitrary and capricious. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis"). Consequently, we must invalidate the Approval of the revised SIPs and remand this matter to the EPA to determine which measures, if any, are RACM to be implemented by the States in this case.

C.   Rate of Progress Reductions

The Sierra Club argues next that the EPA could not approve the SIPs for the Washington Area because the plans fail to provide for rate of progress reductions for the years after 1999. We agree.

The Act provides that revisions to a SIP for an area of serious nonattainment must reduce the emission of VOCs by "at least 3 percent of baseline emissions each year," unless the EPA determines that a lesser reduction is called for "in light of technological achievability."  42 U.S.C. s 7511a(c)(2)(B)(i), (ii).  As the Sierra Club observes, therefore, with an attainment date in 2005, "the rate of progress plan for the Washington area had to demonstrate a 9% reduction in emissions from 1996 to 1999, another 9% from 1999 to 2002, and another 9% from 2002 to 2005."  Yet the SIPs provide for no reductions after 1999, and the EPA approved the omission on the ground that "it would be unreasonable to lock the downwind area into fixed progress requirement reductions from local sources, when the combination of local reductions with upwind area source emission reductions is what will bring the area into attainment."  Approval, 66 Fed. Reg. at 603/2.

The EPA's reason is of no moment.  The Act by its terms makes the 3% annual minimum rate of progress a prerequisite for approval of a revised SIP.  The EPA therefore had no authority to approve the SIPs for the Washington Area notwithstanding the omission of a rate of progress plan for the years after 1999.

D.   Contingency Measures

    Finally, the Sierra Club argues that the absence of contingency measures also precludes approval of the revised SIPs for the Washington Area.  Again, we agree.

    Section 172(c)(9) of the Act requires that a revised SIP include "specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date."  42 U.S.C. s 7502(c)(9);  see also id. s 7511a(c)(9) (revised SIP for area of serious nonattainment "shall provide for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone").  The EPA maintains that "contingency measures are required as part of the overall nonattainment plan, not as a feature of each component of that plan."  Compare 42 U.S.C. s 7502(c)(9) ("plan shall provide for the implementation" of contingency measures), with, e.g., id. s 7502(c)(1) ("plan provisions shall provide" for implementation of RACM).  Therefore, says the EPA, it lawfully could approve the revised provisions of the SIPs for the Washington Area despite the absence of contingency measures therein.

    The answer to the EPA's argument is, as the Sierra Club points out, to be found in s 172(c), which lists the elements that must be included in a revised SIP for an area in nonattainment.  That section specifically declares:

> The plan provisions (including plan items) required to be submitted under this part shall comply with the following:  ...
>
> (9) Contingency measures
>
> Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part.  Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

Id. s 7502(c); see also id. s 7511a(c)(9) (requiring that contingency measures "be included in the plan revision" for area of serious nonattainment).

As can be seen from the statute itself, the EPA simply errs in suggesting that a state need not include contingency measures in the revisions to the SIP it submits for an area of nonattainment. For this reason, too, the EPA lacked authority to approve the revised SIPs submitted by the States in this case.

### III. Conclusion

For the foregoing reasons, the EPA's approval of the revised SIPs for the Washington Metropolitan Area is vacated, and this matter is remanded to the Agency for further consideration.

So ordered.